# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **JERRY J. STUBBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | |
| | ) | **No. 03-2093-CM** |
| **MCDONALD'S CORPORATION,** | ) | **consolidated with** |
| | ) | **No. 04-2164-CM** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On February 28, 2003, plaintiff Jerry J. Stubbs brought a class action suit in this court against his former employer, defendant McDonald's Corporation, case number 03-2093-CM.  On March 4, 2005, the undersigned judge denied plaintiff's class certification.  Plaintiff's remaining claims allege that defendant (1) willfully violated the Fair Labor Standards Act ("FLSA"), 29 C.F.R. § 541.100, by improperly classifying plaintiff as an "exempt" employee rather than "non-exempt" and thereby failing to pay plaintiff compensation for overtime hours worked; (2) breached contracts with plaintiff which expressly and impliedly stated that plaintiff would receive a monthly salary based on a forty-five hour workweek; and (3) breached written and oral agreements with plaintiff which expressly and impliedly stated that defendant would adhere to and follow the mandates of the FLSA.

On April 19, 2004, plaintiff brought a second class action suit against defendant McDonald's Corporation, case number 04-2164-CM, alleging failure to promote, constructive discharge, hostile work environment, pay disparity, failure to hire, and "terms and conditions" of employment in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, and 42

U.S.C. § 1981.  The late Judge G. Thomas VanBebber dismissed plaintiff's class action claims, limited his Title VII claims to failure to promote and constructive discharge, and limited his § 1981 claims to failure to promote, constructive discharge, hostile work environment, and pay disparity.

The court consolidated case numbers 03-2093-CM and 04-2164-CM on March 30, 2006. Pending before the court is defendant's Motion for Summary Judgment (Doc. 104) and plaintiff's Motion for Partial Summary Judgment (Doc. 105).

**I.      Facts**[1]

**A.      Plaintiff**

Defendant employed plaintiff, an African-American male, from February 1996 to January 2003. Each of the three McDonald's restaurants in which plaintiff worked are located in Johnson County, Kansas. Plaintiff currently resides in Phoenix, Arizona.

**B.      Defendant's Organizational Structure**

Prior to October 2002, defendant's Kansas City Region was comprised of the company-owned restaurants in Nebraska and the Kansas City metropolitan area.  Within the Kansas City Region was the Kansas City Business Center.  All of the stores in which plaintiff worked throughout his career were in the Kansas City Business Center, which included twenty to twenty-five McDonald's owned and operated stores in the Kansas City metropolitan area on both sides of the Kansas/Missouri state line.  Since October 2002, operations manager Al Rafat has led the Kansas City Business Center.

---

[1] The court construes the facts in the light most favorable to the non-moving party pursuant to Fed. R. Civ. P. 56.  The court has combined the facts proposed by both parties, and included only those that are relevant, material, and properly supported by the record.

### C.      Duties of Defendant's Employees

In each of its restaurants, defendant employs crew members ("crew"), whose job descriptions include cooking and packaging the food, taking orders, receiving payment for food orders, keeping the restaurant clean and collecting trash.  Plaintiff worked as a second assistant manager ("second assistant") during his entire tenure with defendant.  The position of second assistant is the first salaried position on defendant's management career track.  After being trained, second assistants are eligible for promotion to first assistant managers and store managers.

Certified swing managers are hourly employees who are not on defendant's salaried management career track, but who have the authority to be the highest ranking manager in the restaurant if there are no second assistants, first assistants or store managers present.  When this occurs, swing managers have the authority to send crew members home if the restaurant is overstaffed or for disciplinary reasons, as well as deal with customer complaints.

### D.      The Lenexa Restaurant

From February 10, 1996 to October 15, 1997, plaintiff was a second assistant at the McDonald's-owned restaurant in Lenexa, Kansas.  During this time, plaintiff's store managers rated his overall job performance as "excellent" one time, and "good" six times.  Store manager Theresa Dobson spoke to plaintiff about her concern that he was too attached to a particular station and needed to be able to see the entire floor.  In plaintiff's March 1997 monthly review, Ms. Dobson wrote:

> You need to give more direction to crew as well as swings in order for things to happen.  You are the one who is working the hardest on your shifts.  If you would like to be a crew person, I can supply you with the uniform and give you the pay.  Remember I am paying you to direct, manage and lead the crew . . . .

**E.      The Quivira Road Restaurant**

From October 16, 1997 to September 10, 1999, plaintiff was a second assistant at the McDonald's-owned restaurant on Quivira Road in Shawnee Mission, Kansas.  Plaintiff transferred to the Quivira Road store at the request of Mr. Rafat, who told plaintiff that he was being transferred to make sure that he was adequately trained.  The store manager who was supposed to train plaintiff left shortly thereafter.  Plaintiff received three "good" ratings for his overall job performance while at the Quiriva Road store.

**F.      The K-7 Restaurant**

From September 11, 1999 until his resignation, plaintiff worked as a second assistant at the McDonald's-owned K-7 store.  Operations manager Terry Paxton told plaintiff that he would transfer plaintiff to the store located in Olathe, Kansas at Kansas Highway 7 ("K-7 store"), where plaintiff would work under one of the "strongest managers," Mike Wokutch, in order to speed up his training.  Mr. Wokutch, however, transferred from the K-7 store less than four months after plaintiff arrived.

While at the K-7 store, plaintiff testified in deposition that he was not permitted to train crew members, recommend new hires or recommend the termination of crew members.  During this same period of time, Davor Sarenac, another second assistant at the K-7 store, hired crew members, directed the work of crew members on his shifts, found replacements when crew members did not show up for work, reassigned crew members to different jobs in order to meet customer demand, engaged in walk-throughs of the restaurant to make sure it met defendant's quality standards, and handled customer complaints.

 Plaintiff's reviews while at the K-7 store included one "excellent" overall rating, numerous "good" overall ratings, and two "needs improvement/good" overall ratings.  Plaintiff's managers made the following

comments, among others, in plaintiff's reviews: plaintiff still needed to "work on [his] shift running abilities" and "work on elements of shift running"; plaintiff's "biggest focus should be QSC[quality, service and cleanliness.]"; "[M]anage your shift don't let your shift manage [you]."; plaintiff's focus should be on controlling food costs, people/team development and personal development; "keep on working on shift management"; "[s]hift running skills have not improve[d] much, please [sic] and your attitude is not helping."; "you need to concentrate on your shift running skills"; "[s]hift running needs to Improve [sic], use the pre-shift check list"; and criticism for not having the correct program in place for interviewing and hiring crew members.

During plaintiff's employment at the K-7 store, Mr. Rafat personally observed plaintiff on several occasions.  On one occasion, in the spring of 2002, Mr. Rafat observed plaintiff in the grill area cooking hamburgers rather than running the shift.  On a second occasion, in the summer of 2002, Mr. Rafat observed plaintiff outside the restaurant taking a cigarette break during the middle of the peak lunch hour.  Mr. Rafat considered both incidents to reflect poorly on plaintiff's ability to lead and run a shift.  Mr. Rafat communicated both incidents to store manager Brenda Dunker and area supervisor Bobby Phelps.  Neither of these incidents were documented by Mr. Rafat or defendant.

While at the K-7 store, plaintiff received pay raises in April 2000, 2001 and 2002.  In April 2000, plaintiff received a $220 performance bonus.  Nine other managers received bonuses ranging from $50 to $330.  Plaintiff's bonus was larger than those given to five other assistant managers and two store managers.

**G.      Plaintiff's Readiness for Promotion**

An assistant manager was not limited to promotion within his own store; defendant freely transferred management personnel among stores.  Defendant did not maintain any job postings or other system by which second assistants or first assistants could formally apply for promotion.  Defendant's system of rating and promoting assistant managers is based on objective criteria, including (1) drive-thru service times; (2) food safety requirements; (3) pre-shift checklists; (4) meeting budget for profit and loss line items like supplies, linen and labor; (5) preparing accurate and timely reports; (6) ordering food and monitoring waste; and (7) interviewing applicants.

In 2001, plaintiff had a conversation with senior operations manager Brad Johnson and area supervisor Karen Munsterman about his performance, during which Mr. Johnson told plaintiff he would be promoted in August 2002.  Don Alio, the regional manager of the Kansas City Region from 1987 until August 2001, is plaintiff's brother-in-law; plaintiff is married to Mr. Alio's sister.  Mr. Alio placed the date of the conversation in 2001, not 2002.  Mr. Johnson was no longer an employee with defendant effective August 2001.

In July 2001, Mr. Alio asked his subordinates about plaintiff's progress, who told him that plaintiff was ready for promotion to first assistant.  Mr. Alio testified that plaintiff's store manager "was very high on [plaintiff] and very positive about him and absolutely wanted him to be his first assistant. . . .  That was supposed to happen August 1st [2001]."

Ms. Dunker testified in deposition that she did not recommend plaintiff for promotion to first assistant because he was not performing the managerial duties of his job as a second assistant, although these reasons were not documented.  Plaintiff testified in deposition that store manager Claudia Sanchez had told him not to bother with his training because her superiors would never let her promote him.  There

is no record that plaintiff was ever disciplined while working for defendant or that plaintiff was ever involved with defendant's official performance improvement procedures.

## H.  Allegations of Race Discrimination and Unequal Treatment

None of defendant's employees made comments of a racial nature to plaintiff during his employment with defendant.  However, plaintiff believes that race was the reason he was required to work the closing shift at the Lenexa and Quivira Road stores, and why Ms. Dobson once called plaintiff in to work on his day off to pick up trash.  Plaintiff does not know if Ms. Dobson called anyone else in to pick up trash on his or her days off.  Bruce McAfee, an African-American assistant manager at the time, testified in deposition that he had often been relegated to the closing shift and understaffed by a Caucasian store manager.  When Mr. McAfee attempted to complain, he was told by the area supervisor that he needed to "learn how to get along with her" and to "work the shifts anyway."

In 2002, while employed at the K-7 store, plaintiff complained to Ms. Dunker that she unfairly scheduled the delivery truck to arrive at the end of his closing shift, thus requiring plaintiff to participate in unloading it.  Delivery trucks to defendant's restaurants are not scheduled by the store manager.  Plaintiff never claimed that Ms. Dunker assigned plaintiff to work on the delivery truck because of his race.  Moreover, plaintiff never complained about this incident to defendant.  Plaintiff could recall no other unfair treatment he received while Ms. Dunker was the K-7 store manager.

Plaintiff never formally complained to defendant that he was discriminated against or subjected to a hostile work environment because of his race.  Plaintiff asserts that he made three specific attempts to informally complain about race discrimination at defendant.  First, plaintiff complained about his treatment on several occasions to Mr. Alio.  After hearing plaintiff's complaints, Mr. Alio told plaintiff to take them

through the proper channels.  Second, when both plaintiff and Mr. McAfee were assistant managers, plaintiff asked Mr. McAfee if he was going to quit because defendant was insisting that Mr. McAfee transfer to the Prospect Avenue store.  Mr. McAfee recalled plaintiff telling him to call Mr. Alio.  Third, Mr. Sarenac, a Caucasian who was promoted over plaintiff and is currently a store manager, testified that on the first day he met plaintiff, when he and plaintiff were both second assistants, plaintiff informed him that he "never got a chance" at being promoted because of his race.

Although plaintiff understood defendant's policy against discrimination and harassment, he testified in deposition that, "[a]t McDonald's, you don't complain unless you are planning on taking the wrath, because you will get it.  You don't complain to anybody.  That open door policy is an open trap policy."  Other current and former executives shared this belief.  Mr. Alio acknowledged that Terry Paxton, who left defendant in June 2001, was known to manage through fear.  Mr. Alio testified in deposition that, "Terry's people were afraid to say anything.  Even his supervisors were afraid to say anything to me."

Cheryl Briggs, plaintiff's manager at the Quivira Road store in 1999, racially demeaned her employees.  Plaintiff encouraged the crew members at the Quivira Road store to write an anonymous letter to defendant's regional office in Kansas City describing their complaints.  The anonymous letter complained that Ms. Briggs treated all employees at the Quivira Road store badly.  The letter did not mention race as a basis for harassment or discrimination.  Defendant admits that Ms. Briggs had issues with minority employees and mistreated her employees.  Ms. Briggs was fired on December 1, 1999.

## I.    Allegation of Racial Segregation

For a period of time from 2000 to 2001, defendant owned and operated a store at the  intersection of 14th and Prospect Avenue in Kansas City, Missouri.  The Prospect Avenue store is in the inner-city, and

is classified by defendant as a "high crime area" store.  Area supervisor Bobby Shaw told plaintiff that an

opening existed at the Prospect Avenue store and indicated that plaintiff could work there with a store

manager who could train him.  When plaintiff asked whether the transfer to the Prospect Avenue store

would mean a promotion, Mr. Shaw said, "[n]o, but you have a better chance of being promoted because

you'll be working with somebody that will – you know, that can better help you."  Plaintiff declined the

transfer to the Prospect Avenue store.

Mr. McAfee, an African-American who was a first assistant manager at the time, testified that he

received the same request from Mr. Shaw: "[h]e said that they needed a strong African-American male

down here, somebody who could relate to the customer base.  He said it was an opportunity for me."

After Mr. McAfee initially declined the transfer, Mr. Paxton came to talk to him about the request.  When

he continued to refuse the transfer, Mr. Paxton told Mr. McAfee that he "would never be anything other

than what [he] was."  Mr. Shaw again approached Mr. McAfee and explained that defendant wanted to fill

the first assistant manager opening with an African-American male.  Mr. McAfee attempted to contact Mr.

Alio, the regional manager, regarding the request, but was brushed off.  Mr. McAfee's conclusion was that

it would be futile to complain.  Mr. McAfee did eventually accept the transfer, and is currently an executive

for defendant.

While working at the K-7 store, plaintiff overheard someone comment that "he didn't need any

more black managers in Johnson County."  Plaintiff testified in deposition that he thought Mr. Paxton made

the comment to Mr. Rafat, but shortly thereafter testified that he was sure Mr. Paxton made the comment.

Plaintiff did not actually see Mr. Paxton and Mr. Rafat while they were talking, nor did he hear any other

part of the conversation.  Plaintiff testified that the conversation occurred "maybe three, two weeks before

[plaintiff] quit."  Mr. Paxton left defendant in June 2001, or about eighteen months before plaintiff resigned.

Plaintiff later testified in deposition that he believed Mr. Paxton still worked for defendant when this

comment was made.

Defendant's corporate representative, Mr. Rafat, explained via hypothetical how defendant uses

race as a criteria in making managerial assignments:

> A.  We take a look at all of our management team.  And let's say we have
> six restaurant managers.  We take a look at how many whites we have,
> how many blacks we have, how many Hispanics we have, you know how
> many others we have, and we take a look at that mark-up and we evaluate
> it based on what we believe is a good mix for us to be successful.
>
> Q.  Okay.  Who defines what the good mix for us to be successful is?
>
> A.  It's based on -- as an [operations] manager, it's believe [sic] is a good
> representation of my crew and a representation that would entice minorities
> to want to join my team.

 Former president of defendant's operations in Kansas City, Don Thompson, testified similarly:

> Q.  But what if it was specifically, "We need a black man in this store
> because its [sic] in a black neighborhood"?  Do you view that as
> acceptable under McDonald's policies?
>
> A. Not knowing the full situation, if this is an opportunity for growth, in that
> [the] person can relate to the customers, and if that person is desirous of
> the opportunity, those things being the case I look at it and say it may
> provide a great opportunity for someone.  If your point [is] it's a threat, we
> don't -- that's not something we would condone, no.

## J.    Similarly Situated Second Assistants

Defendant points to two American-Africans who worked in the Kansas City Region as second

assistants for fifteen and twenty years but were not promoted due to inadequate leadership skills.  On the

other hand, defendant promoted three African-American second assistants within the Kansas City Business

Center.  One of these employees, Mr. McAfee, did not work in suburban Johnson County where plaintiff

worked; he worked at a store at 87th and State Line Road, which defendant classified as being in a high

crime area.

## K.    Plaintiff's Resignation

Defendant never promoted plaintiff to first assistant.  Plaintiff resigned his employment with

defendant in January 2003.  Plaintiff's resignation letter does not state a reason for his departure.  Plaintiff

testified that he resigned because, after seven years without a promotion, he "wasn't going to stick around

and be humiliated another day."  "[I]t was plain and obvious I was being discriminated against.  It's plain,

it's obvious.  They're -- they're -- they're promoting over me for no obvious reason."

After his resignation, plaintiff moved to Phoenix, Arizona where he went to work for his

brother-in-law, Mr. Alio, in a restaurant venture.  Plaintiff worked as an assistant manager for Mr. Alio for

about three months.  Plaintiff then went to work for Berge Ford in Phoenix, Arizona.  In filling out his

application form at Berge Ford, plaintiff stated that he left defendant to "relocate to warmer weather due to

wife's health."  Plaintiff signed this application, which read: "I hereby state that all information that I provide

on this application and in any interview is true and accurate."

## L.    Breach of Contract Claim

At the time plaintiff was hired in 1996, he signed an employment application which stated, "At

McDonald's, my employment is at will."  Plaintiff was told by Mr. Rafat, Rob Clayton, a Kansas City

Business Center manager, and Wendy Stevens, one of plaintiff's store managers, that assistant managers

were "expected" to work forty-five hours a week.  The Kansas City Region Security and Business

Practices Policies stated that "[d]ue to the nature of our business and the expectations of our customers,

store management employees have weekly schedules that will vary.  Store management are [sic] expected

to work a nine (9) [hour] work day."

**M.     FLSA Claim**

Despite his title as a second assistant, plaintiff primarily performed the duties and responsibilities of

crew members.  Plaintiff's FLSA affidavit states that he was forced to neglect or relinquish altogether his

managerial duties due to a "business practice" of under staffing the restaurants in the Kansas City Business

Center:

> The reduction of hourly labor . . . forced me, as well as other first and
> second assistant managers, to carry out the duties and responsibilities of the
> staff, who were compensated on an hourly basis.  That is, the title of
> assistant manager was deceptive in that assistant managers were actually
> hourly laborers.  Any managerial duties were, in most cases, forced to be
> neglected, or relinquished all together.  The effect was one in which the
> other assistant managers and I were forced to work over forty hours per
> week without overtime compensation.

(Pl.'s Aff. at 3).  Defendant asserts that other second assistants in the Kansas City Business Center were

able to perform the management duties requested of them.

**II.     Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue

as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most

favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**III.     Analysis**

**A.     Defendant's Summary Judgment Motion**

-12-

1.     **Race Discrimination Claims**[2]

a.     **Hostile Work Environment**

Like his other race discrimination claims, plaintiff's hostile work environment claim alleges that defendant imposed a broad "segregationist policy" of attempting to transfer African-American managers to inner-city, predominately African-American stores such as the Prospect Avenue store.  When plaintiff declined to transfer to the Prospect Avenue store, plaintiff alleges that "it was made clear to him that [he] was not going to be promoted as long as [he] . . . continued to work in Caucasian neighborhoods." Defendant argues that, even if true, plaintiff's allegations do not rise to the level of a hostile work environment.

"To survive summary judgment on a racially hostile work environment claim, a plaintiff must show 'that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus.'" *Chavez v. N.M.*, 397 F.3d 826, 831-32 (10th Cir. 2005) (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)) (other citations omitted).  Furthermore, this burden cannot be met "by demonstrating 'a few isolated incidents of racial enmity' or 'sporadic racial slurs'"; plaintiff must instead demonstrate "'a steady barrage'" of racially offensive comments. *Id.*

---

[2] Defendant argues that many of plaintiff's arguments are barred because they occurred more than 300 days before plaintiff filed his Title VII EEOC complaint, 42 U.S.C. § 2000e-5(e)(1), and more than four years before plaintiff filed his § 1981 claim, 28 U.S.C. § 1658(a); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 369 (2004).  Defendant did not, however, articulate exactly which arguments might be affected by these limitations, nor did defendant discuss this argument in its reply.  For these reasons, the court declines to address this argument.

Plaintiff primarily argues that defendant's alleged policy of racially segregating African-American managers to inner-city stores such as the Prospect Avenue store created a racially hostile work environment.[3]  Even when viewed in the light most favorable to plaintiff, plaintiff's evidence does not rise to the level of a hostile work environment.  Plaintiff points to several allegedly racially-motivated incidents or comments.  First, plaintiff overheard Mr. Paxton state that defendant did not need any more African-American managers in Johnson County.  However, this comment was a single incident that was overheard by—not directed at—plaintiff.  *See Witt v. Roadway Exp.*, 136 F.3d 1424, 1433 (10th Cir. 1998) ("The fact that the insult was only inadvertently overheard indicates a lower degree of animosity and severity than is present in the typical case, in which a harassing supervisor deliberately inflicts the harassment on the victim.").  Second, Mr. Shaw suggested that plaintiff transfer to the Prospect Avenue store.  This conversation, however, is not evidence of a racially hostile work environment because Mr. Shaw did not mention race during the conversation.  Third, Mr. McAfee told plaintiff about statements defendant made to him, including that defendant wanted an African-American manager to transfer to the Prospect Avenue store, but these statements were not directed at plaintiff.

Additionally, plaintiff believes that race was the reason he was required to work the closing shift at the Lenexa and Quivira Road stores, and why his store manager Ms. Dobson once called plaintiff in to

---

[3] Plaintiff puts a great deal of emphasis on his argument that defendant's alleged policy of racial segregation violates 42 U.S.C. § 1981.  Plaintiff cites numerous cases in which courts have denied summary judgment on race discrimination claims where employers made employment decisions on the basis of race.  *See, e.g., Hall v. Lowder Realty Co., Inc.*, 160 F. Supp. 2d 1299, 1317-18 (M.D. Ala. 2001) (denying summary judgment on a § 1981 discrimination claim where an African-American real estate agent only received referrals to assist African-American buyers).  However, none of these cases involve claims for hostile work environment under § 1981. The standards for race discrimination and hostile work environment claims under § 1981 are different, and the court will analyze each claim separately using the appropriate standard.

work on his day off to pick up trash.  Even assuming race was the reason plaintiff was required to work the

closing shift and pick up trash on one occasion, the court finds that these actions are not the pervasive or

severe harassment required to establish a claim of racially hostile work environment.  *Chavez*, 397 F.3d at

831-32.  Most significant to the court's analysis is plaintiff's admission that no one at defendant made

comments of a racial nature to him during the period that plaintiff worked at defendant.

Viewing all the evidence in favor of plaintiff, the court finds that defendant has established that no

genuine issues of material fact exist, and that, as a matter of law, no reasonable jury could conclude that

defendant subjected plaintiff to pervasive or severe harassment that stemmed from racial animus.  *Chavez*,

397 F.3d at 831-32.  Thus, summary judgment is granted on this claim.

**b.**     **Failure to Promote**

In analyzing plaintiff's failure to promote claim, the court will apply the burden-shifting framework

set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Under *McDonnell*

*Douglas*, in order to survive summary judgment, plaintiff must first establish a prima facie case of

discrimination.  *Id.* at 802.  If plaintiff carries that burden, defendant must then articulate a facially

nondiscriminatory reason for the challenged employment action.  *Id.*  If defendant makes such a showing,

the burden reverts to plaintiff to prove the proffered nondiscriminatory reason is pretextual.  *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993).

The prima facie case for a failure to promote claim under § 1982 requires plaintiff to demonstrate

that (1) he was a member of a protected class; (2) he applied for and was qualified for the position; (3) he

was not promoted; (4) the position was filled or remained open.  *Espinoza v. Coca-Cola Enter., Inc.*,

167 Fed. Appx. 743, 744 (10th Cir. 2006); *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306-07

(10th Cir. 2005) (citation omitted).

Neither party disputes that plaintiff is an African-American, was not promoted, and that the position

was filled or remained open.  At issue first is whether plaintiff applied for the position of first assistant.

Defendant did not have an application process by which assistant managers could formally apply for

promotion.  Instead, the record demonstrates that store managers continually evaluate and promote second

assistants based on qualifications and need.  Because an assistant manager was not limited to promotion

within his own store, defendant was not waiting for a particular position to open before promoting plaintiff.

The court finds that defendant's informal method of continually evaluating whether assistant managers are

ready for promotion satisfies the application requirement for plaintiff's prima facie case.  *See Walker v.*

*Prudential Prop. and Cas. Ins. Co.*, 286 F.3d 1270, 1275 (11th Cir. 2002) ("We have said that 'when

an employer uses such informal methods [to promote its employees,] it has a duty to consider all those who

might reasonably be interested' in the available position." (citation omitted)).

Next, the court considers whether plaintiff was qualified for the position of first assistant.  Plaintiff

argues that because defendant had no written qualifications for first assistants, the qualifications are a factual

question for the jury.  The court finds that defendant's lack of a specific, objective set of qualifications does

not create a genuine issue of material fact.  The Tenth Circuit has held that "[e]mployers, not employees or

courts, are entitled to define the core qualifications for a position, so long as the criteria utilized by the

company are of a nondiscriminatory nature.'"  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 938 (10th Cir.

2005) (quoting *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 765 (7th Cir. 2001) (noting that

"[w]hat the qualifications for a position are, even if those qualifications change, is a business decision, one

courts should not interfere with")).  The qualifications required to be promoted from second assistant to first

assistant is defendant's business decision, not this court's or a jury's.  Defendant's lack of written

qualifications does not create a genuine issue of material fact.

Defendant argues that plaintiff lacked the managerial skills necessary for promotion to first assistant.

Viewing the evidence in the light most favorable to plaintiff, the court finds that genuine issues of material

facts exist regarding whether plaintiff has met this requirement.  There is significant evidence that plaintiff

struggled with his management duties as a second assistant.  For instance, although plaintiff generally

received "good" overall ratings, plaintiff also received "needs improvement/good" ratings in July 2000 and

September 2000.  His store managers consistently criticized his management skills.  Ms. Sanchez, one of

his store managers at the K-7 store, unequivocally told plaintiff that her superiors would never let her

promote him.  Mr. Rafat, an operations manager and Ms. Sanchez's boss, was displeased with plaintiff's

leadership ability after observing him on two occasions.  And Ms. Dunker testified in deposition that she did

not recommend plaintiff for promotion to first assistant because he was not properly performing his

managerial duties as a second assistant.

Defendant also argues that plaintiff's allegation that he primarily carried out the duties and

responsibilities of the crew members while neglecting his management responsibilities proves that plaintiff

could not perform the management functions required of a second assistant, let alone those of a first

assistant.[4]  Plaintiff has not set forth any evidence that defendant had a business practice of forcing its

---

[4] Defendant argues that the court's March 4, 2005 Order denying plaintiff's motion to certify the
class held that plaintiff's failure to perform the management duties of a second assistant "is now law of the
case."  The law of the case doctrine states that a decision upon a rule of law should be upheld throughout
the lawsuit.  *United States v. LaHue*, 261 F.3d 993, 1010 (10th Cir. 2001).  Defendant argues, the court
(continued...)

managers to carry out the duties of the crew members, with the exception of plaintiff's own affidavit and deposition testimony.  In the Tenth Circuit, "a nonmovant's conclusory and self-serving affidavit, without other supporting evidence, is insufficient for the purpose of surviving summary judgment." *Martinez v. U.S. Dep't of Energy*, 2006 WL 270230, at *4 (10th Cir. Feb. 6, 2006) (citing *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n.4 (10th Cir. 2004)) (other citations omitted).  In this particular instance, however, defendant is using plaintiff's affidavit to plaintiff's detriment.  Since plaintiff's affidavit is not self-serving in this context, the court finds it relevant to deciding whether plaintiff was qualified for the position of first assistant.

Notably, plaintiff has offered some evidence that his superiors thought he was ready for a promotion.  In July 2001, plaintiff's subordinates told Mr. Alio that plaintiff was ready for promotion to first assistant.  Mr. Alio testified[5] that plaintiff's store manager "was very high on [plaintiff] and very positive about him and absolutely wanted him to be his first assistant. . . .  That was supposed to happen August 1st [2001]."  Also in 2001, Mr. Johnson told plaintiff that he would be promoted in August 2002.  Because the

---

[4](...continued)
has already held, as a matter of law, that plaintiff was unable to perform the management duties of a second assistant.  The court disagrees.  The court's ruling stated: "Thus, even assuming that other second assistant managers perform the same job duties as plaintiff and thus fell victim to defendant's alleged policy of forcing second assistant managers to perform the duties of hourly employees, the court finds that defendant has properly rebutted the presumption.  Accordingly, the court cannot logically find that plaintiff's putative class of second assistant managers were forced to neglect or relinquish their management duties."  Therefore, the March 4, 2005 order simply ruled that plaintiff failed to prove that other similarly situated second assistants were unable to perform management duties; the court did not make any legal conclusions about plaintiff's ability or inability to perform management duties.

[5]Mr. Alio is plaintiff's brother-in-law.  For purposes of summary judgment, the court views Mr. Alio's credibility in the light most favorable to plaintiff.

record is inconsistent regarding whether defendant believed plaintiff was qualified for a promotion, a genuine issue of material fact remains with respect to whether plaintiff can establish a prima facie case.

The burden then shifts to defendant to offer a legitimate, nondiscriminatory reason for failing to promote plaintiff.  Despite the fact that there is evidence that at least some of plaintiff's supervisors thought he was ready for promotion, the court finds that defendant has met this "'exceedingly light'" burden by setting forth evidence that plaintiff was not qualified for a promotion.  *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (citation omitted).  *See also Garrison v. Gambro*, *Inc.*, 428 F.3d 933, 937 (10th Cir. 2005) ("Indeed, not being qualified for a job is one of the two 'most common nondiscriminatory reasons for [a] plaintiff's rejection.'") (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54; *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

Next at issue is pretext; that is, whether plaintiff has offered sufficient evidence "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 256; *see also Randle v. City of Aurora*, 69 F.3d 441, 451-52 (10th Cir. 1995).  "Evidence of pretext may include, but is not limited to, the following: prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria." *Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999).  The plaintiff may also show pretext by exposing the "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted).

Plaintiff first argues that defendant does not have a basis in the record for its stance that plaintiff did not display the consistent leadership abilities necessary for promotion to first assistant. Here, the court may conduct an analysis similar to its analysis of whether plaintiff was qualified for his promotion with the prima facie case. *See Espinoza*, 167 Fed. Appx. at 745 ("'[W]hether th[e] analysis [of plaintiff's qualification for the job] is conducted in reference to the prima facie case or the business justification versus pretext inquiry, . . . if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result.'" (quoting *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173-74 & n. 5 (10th Cir. 2005))). The court has already discussed numerous examples of deposition testimony and plaintiff's employment evaluations with regard to plaintiff's prima facie case, and has found that defendant has set forth substantial evidence that plaintiff was not qualified for the position of first assistant.

Plaintiff next argues that subjective employment reviews, such as those given by defendant, must be viewed with skepticism. While the court recognizes that subjectivity in the employment evaluation context is relevant to the issue of pretext, *Simms*, 165 F.3d at 1328, subjectivity does not alone create pretext. Moreover, defendant based its evaluations on numerous objective factors.

Plaintiff next argues that he was denied a promotion because he declined to be transferred to the inner-city Prospect Avenue store. In support of this argument, plaintiff cites to a comment he overheard, which said that defendant did not need any more African-American managers in Johnson County.[6] Plaintiff

---

[6]Plaintiff testified that the conversation occurred "maybe three, two weeks before [plaintiff] quit." Mr. Paxton left defendant in June 2001, or about one-and-a-half years before plaintiff resigned. Plaintiff later testified in deposition that he believed Mr. Paxton was employed by defendant when this comment was made. Plaintiff's own self-serving discrepancy cannot create a genuine issue of fact. *Martinez*, 2006 (continued...)

also points to Mr. McAfee, an African-American, who testified that when he was offered a transfer to the Prospect Avenue store, defendant told him that they needed a "strong African-American male" who could "relate to the customer base." Mr. McAfee eventually accepted the transfer and was later promoted, while plaintiff declined the transfer and was not promoted.

The record demonstrates that while plaintiff worked for defendant, defendant might have used race as a basis for making employment decisions. When asked about this subject, Mr. Rafat, defendant's corporate representative, stated:

> We take a look at how many whites we have, how many blacks we have, how many Hispanics we have, you know how many others we have, and we take a look at that mark-up and we evaluate it based on what we believe is a good mix for us to be successful.
>
> Q. Okay. Who defines what the good mix for us to be successful is?
>
> A. It's based on -- as an [operations] manager, it's believe [sic] is a good representation of my crew and a representation that would entice minorities to want to join my team.

Moreover, when asked if defendant would purposefully place an African-American in an African-American dominated neighborhood, Mr. Thompson, former president of defendant's operations in Kansas City, did not deny that race might play a factor in the decision.

Based on this evidence and the record as a whole, and viewing the evidence in the light most favorable to plaintiff, the court finds that plaintiff has met his burden of demonstrating pretext. The record indicates that race might have been a factor in defendant's decisions to transfer managers. *See Simms*, 165

---

[6](...continued)
WL 270230, at *4.

F.3d at 1328 ("Evidence of pretext may include . . . the employer's policy and practice regarding minority

employment.").  Therefore, a reasonable jury could conclude that plaintiff was not promoted because he

declined a potentially racially-motivated transfer to the Prospect Avenue store.  Accordingly, the court

denies summary judgment on this claim.

**c.**      **Constructive Discharge**

Plaintiff alleges that he was forced to resign because defendant's "segregationist policy" left plaintiff

with no hope of advancement.  Defendant asserts that plaintiff voluntarily resigned, and that the workplace

was not permeated with such intolerable conditions that plaintiff had no choice but to quit.

"'A constructive discharge occurs when a reasonable person in the employee's position would

view her working conditions as intolerable and would feel that she had no other choice but to quit.'"

*Zisumbo v. McCleodUSA Telecomm. Servs., Inc.*, 154 Fed. Appx. 715, 729 (10th Cir. 2005) (quoting

*Tran v. Trustees of State Colls.*, 355 F.3d 1263, 1270 (10th Cir. 2004)).  "The question is not whether

working conditions at the facility were difficult or unpleasant," but whether "'his employer did not allow him

the opportunity to make a free choice regarding his employment relationship.'"  *Id.* (quoting *Yearous v.*

*Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997)).

"The typical constructive discharge claim alleges that an employer created a hostile work

environment which rendered working conditions intolerable."  *Premratananont v. S. Suburban Park &*

*Recreation Dist.*, 1998 WL 211543, at *2 (10th Cir. Apr. 30, 1998).  *Compare DeFlon v. Danka*

*Corp.*, 1 Fed. Appx. 807, 819 (10th Cir. 2001) ("[W]e conclude that the district court properly granted

summary judgment to [the defendant] on [the plaintiff's] constructive discharge claim associated with the

hostile work environment theory.  [Plaintiff] has not shown that a genuine issue of material fact exists as to

-22-

her hostile work environment claim, and the hostile work environment theory therefore cannot support the constructive discharge claim."), *with Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) ("Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim.") (citation omitted).  A constructive discharge claim may also be "based in part on a discriminatory act such as a failure to promote for discriminatory reasons."  *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1229 (10th Cir. 2001) (citations omitted).  "However, a finding of constructive discharge may not be based solely on a discriminatory act; 'there must also be aggravating factors that make staying on the job intolerable.'"  *Id.* (quoting *James v. Sears, Roebuck & Co., Inc.*, 21 F.3d 989, 992 (10th Cir. 1994)).

Pursuant to its previous ruling granting summary judgment on plaintiff's failure to promote claim, the court will assume, for the purposes of this analysis, that defendant did not promote plaintiff for discriminatory reasons.  But plaintiff cannot defeat summary judgment on this assumption alone; plaintiff must also demonstrate aggravating factors.  *Bennett*, 258 F.3d at 1229.  Therefore, the court's analysis hinges on whether plaintiff suffered from aggravating factors that made his job so intolerable that he felt forced to resign.  *Id.*  The Tenth Circuit has specifically found that aggravating factors could include a "perceived demotion or reassignment to a job with lower status or lower pay," or an offer of early retirement "if the employee demonstrates each choice facing the employee makes him worse off," and his employer will discriminate against him if he stays.  *James v. Sears, Roebuck and Co., Inc.*, 21 F.3d 989, 993 (10th Cir. 1994) (citations omitted).

Here, the court finds that plaintiff has failed to demonstrate aggravating factors for several reasons.  First, although plaintiff's summary judgment response acknowledged his requirement to set forth aggravating factors, plaintiff failed to assert any specific aggravating factors.  Second, even if plaintiff had

alleged aggravating factors, the court finds that the record does not support such a finding.  Plaintiff does

not allege that he was demoted or reassigned to another job or location with a lower status.  Although

plaintiff was asked to transfer to the Prospect Avenue store, defendant did not force him to transfer after he

declined.

Third, the record does not support any other conceivable aggravating factors, such as harassment

used to encourage his resignation.  After reviewing the record, the court found that the following alleged

facts are the only facts plaintiff could have alleged—if he had done so—to demonstrate aggravating factors:

plaintiff was not permitted to train crew members, recommend new hires or recommend the termination of

crew members at the K-7 store; race was the reason his managers at the Lenexa and Quivira Road stores

required him to work the closing shift; race was the reason Ms. Dobson required him to pick up trash on

one of his days off at the Lenexa store; Ms. Dunker forced him to unload delivery trucks at the end of his

closing shifts at the K-7 store; Ms. Briggs racially demeaned plaintiff and his co-workers at the Quivira

Road store in 1999; and he overheard Mr. Paxton comment that "he didn't need any more black managers

in Johnson County."  Even viewing these allegations in the light most favorable to plaintiff, however, the

court finds that a reasonable jury could not conclude that these allegations amounted to aggravating factors

contributing to an intolerable workplace.

Fourth, the court finds that plaintiff voluntarily resigned from his employment with defendant.

Following his resignation, plaintiff moved to Phoenix, Arizona and began working for his brother-in-law,

Mr. Alio.  Thereafter, plaintiff wrote on a job application for Berge Ford that he left defendant because

Phoenix's warmer weather was beneficial to his wife's health.  The court also finds it significant that plaintiff

testified in deposition that he resigned from defendant because he was humiliated after working as a second

assistant for seven years without a promotion, and that it was plain to him that defendant did not promote

him for discriminatory reasons.  Plaintiff did not testify that he resigned to escape other aggravating factors.

The court also finds *Brown v. Kinney Shoe Corp*., a recent Fifth Circuit case, persuasive.  237

F.3d 556.  There, an African-American male worked as a manager for the retail chain Foot Locker.  *Id.* at

559.  The plaintiff alleged that African-American managers were not hired to manage "non-ethnic" stores,

and that managers of "non-ethnic stores" were promoted more often.  *Id.*  A jury found in favor of the

plaintiff on his race discrimination claim, which included both failure to promote and constructive discharge

claims.  *Id*. at 560, 563-64.  The Fifth Circuit found that there was sufficient evidence for the jury to find

that the defendant did not promote the plaintiff based on his race.  *Id.* at 565.  But with regard to the

plaintiff's constructive discharge claim, in which he argued that he resigned after the defendant repeatedly

denied him promotions and transfer opportunities, the Fifth Circuit reversed the district court's denial of

judgment as a matter of law.  *Id.* at 566.  The court found that although the plaintiff did not receive benefits

associated with promotion, he did not demonstrate that the defendant subjected him to aggravating factors

such as losing responsibilities, requiring degrading or menial work, or harassing the plaintiff in an effort to

encourage his resignation.  *Id.*; *see also Land v. Midwest Office Tech., Inc.*, 114 F. Supp. 2d 1121,

1146 (D. Kan. 2000) (denying summary judgment on the plaintiff's hostile work environment claim, but

granting summary judgment on her constructive discharge claim because "[t]he record fails to show any

aggravating factors that made staying on the job intolerable, and raises an inference that plaintiff resigned of

her own free will").

Viewing the facts in the light most favorable to plaintiff, the court finds that no reasonable jury could conclude that plaintiff's work place was so intolerable that plaintiff was forced to resign. As such, the court grants summary judgment on this claim.

## 2.    FLSA

The FLSA generally requires employees to receive overtime compensation for work in excess of forty hours per week. 29 U.S.C. § 207(a)(1); *Gagnon v. Res. Tech., Inc.*, 19 Fed. Appx. 745, 746 (10th Cir. 2001). Numerous exceptions apply, including an exception for those employees whose job duties qualify them as a "bona fide executive." 29 U.S.C. § 213(a)(1); *In re: Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1180 (10th Cir. 2005). Several factors must be analyzed to define the term "bona fide executive." *See Gagnon*, 19 Fed. Appx. at 746. Significantly, however, plaintiff does not dispute that his job duties as a second assistant exempt him from mandatory overtime pay requirements pursuant to the FLSA's "bona fide executive" exception. Thus, plaintiff concedes that, as a second assistant, he was not entitled to overtime compensation under the FLSA.

Notwithstanding, plaintiff contends that defendant willfully violated the FLSA **by** improperly classifying plaintiff as an "exempt" employee rather than "non-exempt" and thereby failing to pay plaintiff compensation for overtime hours worked. In particular, plaintiff argues that certified swing managers and shift managers perform the same duties. But swing managers are hourly workers eligible for overtime and are not on defendant's managerial career track. Plaintiff contends that since he had no prospect of promotion under defendant's alleged racially segregationist policy, he should have been paid as a swing manager, including receiving overtime pay.

After thoroughly reviewing the record, the court finds that there are only two managerial duties that certified swing managers may perform while acting as the shift manager: (1) sending crew members home if the restaurant was overstaffed or for disciplinary reasons; and (2) dealing with customer complaints.[7] Neither party disputes that second assistants and certified swing managers share these duties. However, the record demonstrates that second assistants are also responsible for interviewing and hiring crew members, training, ensuring product quality, verifying that food safety checks have been completed, deciding how much food will be produced on their shifts, and performing or giving input on crew members' performance reviews.

The record is clear that defendant expected plaintiff to perform all of the duties of a second assistant, including those additional duties not shared with certified swing managers. For example, in plaintiff's July 23, 2002 review, Ms. Dunker criticized plaintiff for not having the correct program in place for interviewing and hiring crew members. The duties of certified swing managers did not include interviewing and hiring crew members. In an evaluation of plaintiff, Ms. Dobson stated: "You need to give more direction to crew as well as swings in order for things to happen." Clearly, Ms. Dobson expected plaintiff to manage the certified swing managers, and did not limit his duties to those of certified swing managers.

Plaintiff's arguments can be summarized as claiming that defendant never intended to promote plaintiff, but instead allowed plaintiff to go on as an "overworked and underpaid Certified Swing Manager

_____

[7] Although plaintiff asserts that certified swing managers perform additional duties while acting as the shift manager (i.e. when no other managers are present), plaintiff's deposition testimony was limited to these specific duties. The court presumes that as the highest ranking manager in a store, certified swing managers might also be required to perform other duties, such as directing the work of the crew members. However, the court limits its findings to those duties supported by the record.

in a dead end job."  In other words, plaintiff essentially argues that at the moment defendant decided that

plaintiff would not be promoted to first assistant (assuming such a decision was finalized), plaintiff's job

duties changed to those of a certified swing manager.  Notably, plaintiff offers no evidence or support for

this assertion.  Even if plaintiff was in a dead end job, plaintiff was still expected to fulfill the duties of other

second assistants, and therefore continued to qualify as a "bona fide executive" for FLSA purposes.  The

court grants summary judgment on this claim.

**3.      Breach of Contract Claims**

        Plaintiff asserts two breach of contract claims.  First, plaintiff asserts that defendant breached an

expressed and implied contract that defendant would adhere to and follow the mandates of the FLSA and

Kansas law regarding the payment of overtime compensation.  In light of the court's ruling granting

summary judgment to defendant on plaintiff's FLSA claim, this claim is moot.

        Second, plaintiff asserts that defendant breached an expressed and implied contract with plaintiff

regarding the number of hours plaintiff would be required to work.  The parties do not dispute that Mr.

Rafat, Mr. Clayton, and Ms. Stevens told plaintiff that assistant managers were "expected" to work forty-

five hours a week, or that defendant's Kansas City Region Security and Business Practices Policies stated

that "[d]ue to the nature of our business and the expectations of our customers, store management

employees have weekly schedules that will vary.  Store management are expected to work a nine (9) [hour]

work day."  The crux of defendant's argument is that plaintiff has not offered sufficient evidence to prove

that defendant's expectations created a binding contract that plaintiff would work no more than forty-five

hours a week.

In general, "whether an implied contract exists under Kansas law is typically a question of fact for the jury." *Warren v. City of Junction City, Kan.*, 176 F. Supp. 2d 1118, 1126 (D. Kan. 2001) (citing *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995)). A defendant may defeat summary judgment, however, when (1) there are no essential facts in dispute; (2) the court finds, as a matter of law, that defendant cannot be found liable for the breach; and (3) when the plaintiff "'presents only evidence of his own unilateral expectations.'" *Id.* (quoting *Kastner v. Blue Cross & Blue Shield of Kan., Inc.*, 894 P.2d 909, 916 (Kan. App. 1995)) (other citations omitted). Finding that the parties agree on the essential facts, the court continues with its analysis. The Kansas Supreme Court has given additional guidance for deciding whether the parties entered into an implied contract:

> "Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

*Id.* at 1126-27 (quoting *Morriss v. Coleman Co.*, 738 P.2d 841, 848-49 (Kan. 1987)).

Here, plaintiff argues that defendant's business policy and oral statements created an implied contract whereby plaintiff was limited to only working forty-five hours per week. Plaintiff seeks damages for hours he worked beyond forty-five hours per week.

The court finds that, after reviewing the evidence in the light most favorable to plaintiff, no reasonable jury could conclude that plaintiff and defendant intended to enter into an implied contract that limited plaintiff to working forty-five hours per week. Quite simply, the record demonstrates that plaintiff

-29-

was a salaried manager who was expected to work nine-hour days, or approximately forty-five hours a week.  Defendant's Kansas City Region Security and Business Practices Policies stated that "[d]ue to the nature of our business and the expectations of our customers, *store management employees have weekly schedules that will vary*.  Store management are expected to work a nine (9) [hour] work day."  (emphasis added).  The plain language of this policy states that although management is expected to work nine-hour days, a manager's weekly hours will vary.  Thus, a manager might work four nine-hour days one week, and six nine-hour days the next.  No reasonable jury could construe defendant's business policy to create a binding contract limiting plaintiff's work week to no more than forty-five hours on any given week.

Furthermore, when Mr. Rafat, Mr. Clayton, and Ms. Stevens told plaintiff that assistant managers were "expected" to work forty-five hours a week, no reasonable jury could conclude that plaintiff and defendant intended to enter into a binding contract limiting plaintiff to working no more than forty-five hours per week.  Plaintiff presented no other evidence of the parties' alleged implied contract.  In sum, the court finds that plaintiff "'presents only evidence of his own unilateral expectations,'" and as a matter of law, defendant cannot be found liable for breach of an implied contract.  As such, the court grants summary judgment on this claim.[8]

**B.     Plaintiff's Motion for Partial Summary Judgment**

Plaintiff's motion for partial summary judgment seeks summary judgment on four of defendant's affirmative defenses with regard to plaintiff's breach of contract claims.  In light of the court's ruling granting

---

[8] Defendant argues that plaintiff's breach of contract claims are barred by the applicable three year statute of limitations pursuant to Kan. Stat. Ann. § 60-512.  Defendant declined to revisit this argument in its reply.  Moreover, the court finds that this issue is moot in light of the court's rulings on the merits.

defendant summary judgment on plaintiff's breach of contract claims, the court finds that plaintiff's motion is moot.

**IT IS THEREFORE ORDERED** that defendant McDonald's Corporation's Motion for Summary Judgment (Doc. 104) is granted in part and denied in part.  Specifically, the court denies summary judgment on plaintiff's failure to promote claim in violation of 42 U.S.C. § 1981, and grants summary judgment on all other claims.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Partial Summary Judgment (Doc. 105) is denied as moot.

Dated this 20th day of June 2006, at Kansas City, Kansas.

                                           **/s Carlos Murguia**
                                           **CARLOS MURGUIA**
                                           **United States District Judge**